UNITED STATES DISTRICT COURT
OF THE WESTERN DISTRICT OF TENNESSEE

| WILLIAM KELLY, | ) |
| --- | --- |
| PLAINTIFF, | ) |
| | ) CASE NO. |
| VS. | ) |
| | ) |
| THREE RIVERS MARKET, | ) |
| | ) HON. |
| DEFENDANT. | ) |
| | ) |

*There are no other prior or pending cases between these parties.*

## COMPLAINT

PLAINTIFF, WILLAIM KELLY, by and through his attorneys, Carla D. Aikens, P.L.C., submits the following Complaint against DEFENDANT, THREE RIVERS MARKET.

## JURISDICTION

1. At all times relevant to this action Plaintiff was a resident of the State of Tennessee, County of Knox.

2. Defendant Three Rivers Market is a grocery store who has a place of business in Knox County located at 1100 N. Central, Knoxville, Tennessee 37917.

3. All relevant actions giving rise to this complaint took place in Knox County, Tennessee.

4. This action is brought in this Court on the basis of federal question jurisdiction, pursuant to Title VII of the Civil Rights Act of 1964, 42 USC 2000e et seq.

5. Jurisdiction is proper pursuant to the Tennessee Human Rights Act ("THRA"), T.C.A. 4-21-101, et seq.

## VENUE

6. Venue is proper in the Eastern District of Tennessee pursuant to Section 706(f)(3) of Title

1

VII, 42 U.S.C. § 2000e-5(f)(3), because the unlawful employment discrimination giving rise to Plaintiff's claims occurred in this District.

**STATEMENT OF FACTS**

7. On or around March 30, 2021, Plaintiff, William Kelly, was hired by Three Rivers Market, to work for Defendant as the Store Manager (Level 5), which made him the highest operational employee in Defendant's store at the time.

8. Not long after Plaintiff began, he experienced mistreatment by Jacqueline Arthur and Homer Griffith.

9. When Plaintiff was hired, he was not provided a complete job description, allegedly due to the position just being created.

10. Plaintiff had significant experience relevant experience with larger stores, and Defendant's employees treated him as if he were a perfect fit for the job.

11. At the time Plaintiff began, an MCS (members, customer service) manager who was at Level 3 was leaving within two weeks, and Plaintiff had to absorb her role, as well.

12. Plaintiff understood that his job as a Level 5 manager was to oversee lower level managers.

13. Plaintiff made many changes upon noticing compliance issues with the store; and though he never received a 90-day evaluation as promised, he was told by Arthur, the general manager, that she liked everything that he was doing with the store.

14. When Plaintiff began, he noticed that employees were disgruntled, in particular with Arthur's treatment of them, as they did not feel that human resources was helpful when issues arose.

15. Some of the issues that Plaintiff solved including a new stocking system to prevent employee injuries, and fixing a mice infestation.

16. Sales increased in the time he was there due in part to the plan Plaintiff put into place to make items easier to find for customers.

17. Plaintiff's employees at the store felt that they could trust him and would often come to him with issues that they were having with other members of upper management.

18. Members of staff also liked Plaintiff because he made their job easier due to the changes he implemented.

19. Arthur disliked Plaintiff's rapport with employees because she mistreated them and they did not care for her.

20. A union was in the process of forming because of the mistreatment perpetuated and allowed by Arthur.

21. Plaintiff had been warned by staff that Arthur was a micro-manager who belittled staff, but Plaintiff did not experience it until he tried to support other employees.

22. Specifically, Plaintiff went to Homer Griffith, who was in human resources, and Arthur to try to ease tensions between an employee and a white female grocery manager named "Heather."

23. When he did this, Plaintiff's position was disregarded and he was told to stay out of it and to direct employees to speak directly with Griffith and Arthur, which undermined his authority.

24. Given the make-up of the store, that Plaintiff was the only African American manager, Plaintiff was disappointed.

25. Further, Heather continued to cause problems with staff, including causing another grocery manager to quit after three days due to the mistreatment.

26. Plaintiff reported this and was again told to stay out of it by Griffith and Arthur.

27. A few days later, a customer submitted an online review stating that a "red headed lady" was speaking horribly to staff. Heather was the only person to whom this could have referred.

28. Plaintiff sent the review to Griffith with a note indicating that this was what he was saying.

29. Instead of addressing it, Arthur went online and disputed the complaint as false, despite Plaintiff having told her the same thing prior to the review being posted.

30. A few days later, another employee was crying due to mistreatment by Heather, and Plaintiff spoke to her about it and reported it to Griffith in HR.

31. Griffith advised Plaintiff that Arthur would be involved.

32. The following week, Plaintiff went on vacation. When he returned, he was told by the employee that she was told not to talk to him anymore and that she was not doing her job properly and needed to be retrained.

33. Immediately following this conversation, Arthur approached Plaintiff and asked to speak with him, and Griffith joined them in a meeting.

34. Griffith and Arthur grilled Plaintiff about the employee who was crying, which Plaintiff explained, and they then grilled him about the steps he had taken during the incident.

35. Griffith and Arthur accused Plaintiff of removing the employee from her post without informing Heather, since they spoke in the back parking lot where the staff parks, though they referred to this as taking her off of "company property."

36. Though it was supposed to be his job, Plaintiff was told that he should not have gotten involved in the incident and that the crying employee was entirely at fault.

37. Arthur then stated that the employee probably has a mental illness and that she was taking out her frustrations at work because "COVID has caused everyone to be stressed."

38. Plaintiff was shocked by the statements being made by Arthur.
39. Arthur continued to state that another grocery staff member had a meltdown while Plaintiff was on vacation, but that he was "on the spectrum" with a disability so he was not "all the way there."
40. Plaintiff was then directed to write an incident report about the crying employee, which Plaintiff did not think was proper, because they wanted it in her file.
41. Plaintiff then asked why he was not instructed to write an incident report when a nasty customer called him a "n*****" and spit on him, which had happened a few months prior.
42. At the time of that incident, Arthur said she knew the woman and claimed that she "must be having a bad day," and did nothing.
43. After this, no staff member would speak with him for fear of getting in trouble.
44. Employees would speak to him quickly and told him that they were told not to deal with him.
45. Arthur also changed her behavior, nitpicking with Plaintiff about all of his duties, including how he trained people, his daily tasks and anything else in an apparent attempt to find fault with something that he was doing.
46. In another incident, an employee was fired over the phone for a false work performance issue. Neither Arthur nor Griffith ever told Plaintiff that the employee had been fired.
47. Plaintiff spoke with Arthur about the incident with the crying employee to figure out what she wanted him to put in the incident report.
48. Arthur stated that he was not to be involved with staff, to which Plaintiff stated that if an employee could not talk to their boss, then he would be the next person up the ladder to consult.

49. Arthur told Plaintiff that he is "no one's boss," and that she was the boss of all department managers and that he was only to oversee MCS and store cleanliness. Plaintiff responded that that did not sound like a store manager but instead an MCS manager with janitorial duties.

50. Plaintiff was not pleased by the conversation because it was clear that his job was being undermined and restricted by Arthur.

51. Because the grocery manager had quit, the store needed to hire another person, but was told by Arthur that he would not be sitting in on the interview.

52. When Plaintiff asked why, considering that was what they had discussed and he had been a part of interviews before, Arthur declined to answer him.

53. From that time forward, Heather the grocery manager did not speak to Plaintiff, and he was removed from projects that he had with other departments.

54. Arthur told Plaintiff to copy her on every email that he sent and when he was talking to someone, she would walk up and just stand there listening to the conversation.

55. One day, Plaintiff sent an email, copying both Arthur and Griffith, praising the MCS department for their hard work, highlighting the few errors they had made on a good sales day.

56. Instead of responding positively, Arthur responded to everyone on the email and asked Plaintiff to print reports prior to the days highlighted to prove there had been growth and a reduction of errors.

57. On approximately November 23, 2021, Plaintiff went into work but was in severe ankle pain and told Griffith and Arthur he needed to leave.

58. The following day, he informed them that he needed to get checked out by a doctor, but that because of Thanksgiving, he was not going to be able to get in until after the holiday.

59. Despite the pain, Plaintiff went to work on Friday but left early due to pain.

60. On Saturday, Plaintiff worked the entire day in a surgical boot he had had from a prior surgery.

61. Plaintiff spoke with Arthur about how difficult it would be to work on his foot due to his job requiring him to always be on his feet, and Arthur agreed and took him off of the schedule, telling him he could work from home on things and to document his time.

62. Plaintiff did work from home, including coordinating a schedule change due to a COVID-19 outbreak among staff.

63. By the end of the week, an MCS employee informed Plaintiff that Arthur did not want them contacting him and that she was absorbing all of his tasks, which was not what Plaintiff had discussed with Arthur.

64. Arthur asked him to come in for a meeting, which Plaintiff declined due to his pain level and his inability to drive, and the meeting was rescheduled until after he found out about his prognosis with his doctors.

65. Just after this, a department manager sent an email regarding questions about an issue at the store, and copied Plaintiff along with all of the managers and Arthur.

66. Arthur responded that the manager should "join the club, Will Kelly made these changes without consulting me and getting my approval."

67. Plaintiff responded that what she was saying was false, and related the time when he discussed it with her and she had approved it. He also stated that he would appreciate her not "throwing him under the bus" for a task she had asked him to complete and approved.

68. Arthur then responded with another email which included just Griffith inquiring about his status. Plaintiff stated with progress on the injury and found out that he was taken off of the schedule for the coming week.

69. Plaintiff was taken off of the schedule by Arthur; he did not request to be removed, he had merely stated that his ability to work depended upon his pain level until he was seen by an orthopedic doctor.

70. Following this email, Plaintiff received notification that his Google work email had been changed. Plaintiff immediately emailed Griffith to inquire about the change but he did not respond.

71. Because he was told to work from home, Plaintiff had no access to his work email.

72. Following this, Plaintiff was terminated on or about December 27, 2021 for alleged attendance issues.

73. Plaintiff contacted the EEOC and filed a charge with the agency on September 8, 2022.

74. On approximately March 14, 2023, Plaintiff obtained his notice of right to sue from the EEOC, and this Complaint follows.

75. Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT I
**DISCRIMINATION ON THE BASIS OF RACE/COLOR IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. 2000e *et seq*. ("Title VII")**

76. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

77. At all material times, Defendant was an employer, and Plaintiff was an employee covered by, and within the meaning of, Title VII, as amended.

78. Defendant's conduct, as alleged herein, violated Title VII of the Civil Rights Act of 1964, which makes it unlawful to harass or discriminate an employee on the basis of that employee's race or skin color.

79. A respondeat superior relationship existed because Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct Plaintiff's daily work activity, as alleged in the statement of facts.

80. Plaintiff is an African American man, and, as a result, is a member of a protected class pursuant to Title VII.

81. Plaintiff was subjected to offensive communication and/or conduct on the basis of his membership in this protected class, including having his position undermined and eliminated, as well as allowing him to be racially harassed at work by customers.

82. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

83. Plaintiff notified Defendant, through its agents/Management, of the unwelcomed conduct and communication and Defendant failed to remedy the unwelcomed conduct or communication.

84. The unwelcomed conduct or communication was intended to or in fact did substantially interfere with Plaintiff's employment and created an intimidating, hostile, or offensive work environment, as alleged in the statement of facts.

85. As a proximate result of the Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

86. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

87. Plaintiff requests the relief as described in the Prayer for Relief below.

## COUNT II
### HARASSMENT ON THE BASIS OF RACE IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. 2000e *et seq*. ("Title VII")

88. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

89. At all material times, Defendant was an employer, and Plaintiff was an employee covered by, and within the meaning of, Title VII, as amended.

90. Defendants' conduct, as alleged herein, violated Title VII of the Civil Rights Act of 1964, which makes it unlawful to harass or discriminate against an employee on the basis of that employee's race or skin color.

91. A respondeat superior relationship existed because managers, including Griffith and Arthur, had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct Plaintiff's daily work activity, as alleged in the statement of facts.

92. Plaintiff is an African-American man, and, as a result, is a member of a protected class pursuant to Title VII.

93. Plaintiff was subjected to offensive communication and/or conduct on the basis of his membership in this protected class, including but not limited to, undermining of his job as a manager, permitting customers to racially harass Plaintiff, and not providing Plaintiff with the same autonomy and "leeway" given to white employees, including Heather the grocery manager.

94. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

95. Plaintiff notified Defendant, through its agents/Management, of the unwelcomed conduct and communication and Defendant failed to remedy the unwelcomed conduct or communication.

96. The unwelcomed conduct or communication was intended to or in fact did substantially interfere with Plaintiff's employment and created an intimidating, hostile, or offensive work environment, as alleged in the statement of facts.

97. As a proximate result of the Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

98. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

99. Plaintiff requests the relief as described in the Prayer for Relief below.

## COUNT III
## RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. 2000e *et seq*. ("Title VII")

100. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

101. At all material times, Defendant was an employer and Plaintiff an employee, covered by, and within the meaning of Title VII.

102. Defendant's conduct, as alleged herein, violated Title VII of the Civil Rights Act of 1964, which makes it unlawful to retaliate against an employee for engaging in protected activity.

103. A respondeat superior relationship existed Defendant's agents, including Griffith and Arthur, had the ability to undertake or recommend tangible decisions affecting Plaintiff

and the authority to direct Plaintiff's daily work activity, as alleged in the statement of facts.

104. Plaintiff engaged in protected activity when he took the following actions, including but not limited to, complaining that Defendant did nothing when he was racially harassed by a customer.

105. Defendant, through its employees, had knowledge that Plaintiff engaged in protected behavior, because, among other things, several of them witnessed the conduct and were the individuals to whom Plaintiff reported the harassment and discrimination.

106. Defendant and/or its agents took adverse employment actions against Plaintiff, including but not limited to requiring his to return to work despite the mistreatment he experienced, not accommodating him, failing to promote him, embarrassing and undermining him in front of others, paying him less than others who had less tenure and experience, and making the situation with his colleagues worse until the point that he had no authority in his role.

107. But for Plaintiff's participation in protected activity, Defendant would not have taken said adverse employment actions against Plaintiff.

108. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

109. Plaintiff notified Defendant and its agents of the unwelcomed conduct or communication and Defendant failed to remedy the unwelcomed conduct or communication.

110. As a proximate result of Defendant's retaliatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

111. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

112. Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT IV
### RETALIATION IN VIOLATION OF THE TENNESSEE HUMAN RIGHTS ACT ("THRA") T.C.A. 4-21-101, ET SEQ.

113. Plaintiff hereby incorporates by reference the preceding paragraphs of this Complaint, as if fully set forth herein.

114. At all material times, Plaintiff was an employee, and Defendant was an employer covered by, and within the meaning of the Tennessee Human Rights Act, TCA 4-21-101 et seq.

115. Defendant's conduct, as alleged herein, violated Tennessee Human Rights Act, TCA 4-21-101 et seq., which makes it unlawful to retaliate against an employee for reporting harassment and/or discrimination because of the employee's race.

116. A respondeat superior relationship existed Defendant's agents, including Griffith and Arthur, had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct Plaintiff's daily work activity, as alleged in the statement of facts.

117. Plaintiff engaged in protected activity when he took the following actions, including but not limited to, complaining that Defendant did nothing when he was racially harassed by a customer.

118. Defendant, through its employees, had knowledge that Plaintiff engaged in protected behavior, because, among other things, several of them witnessed the conduct and were the individuals to whom Plaintiff reported the harassment and discrimination.

13

119. Defendant and/or its agents took adverse employment actions against Plaintiff, including but not limited to requiring his to return to work despite the mistreatment he experienced, not accommodating him, failing to promote him, embarrassing and undermining him in front of others, paying him less than others who had less tenure and experience, and making the situation with his colleagues worse until the point that he had no authority in his role.

120. But for Plaintiff's participation in protected activity, Defendant would not have taken said adverse employment actions against Plaintiff.

121. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

122. Plaintiff notified Defendant and its agents of the unwelcomed conduct or communication and Defendant failed to remedy the unwelcomed conduct or communication.

123. As a proximate result of Defendant's retaliatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

124. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

125. Plaintiff requests relief as described in the Prayer for Relief below.

### COUNT V
### DISCRMINATION AND HARASSMENT IN VIOLATION OF THE TENNESSEE HUMAN RIGHTS ACT ("THRA") T.C.A. 4-21-101, ET SEQ.

126. Plaintiff hereby incorporates by reference the preceding paragraphs of this Complaint, as if fully set forth herein.

127. At all material times, Plaintiff was an employee, and Defendant was an employer covered by, and within the meaning of the Tennessee Human Rights Act, TCA 4-21-101 et seq.

128. Defendant's conduct, as alleged herein, violated Tennessee Human Rights Act, TCA 4-21-101 et seq., which makes it unlawful to discriminate against or harass an individual because of the employee's race.

129. A respondeat superior relationship existed because Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct Plaintiff's daily work activity, as alleged in the statement of facts.

130. Plaintiff is an African American man, and, as a result, is a member of a protected class pursuant to the THRA.

131. Plaintiff was subjected to offensive communication and/or conduct on the basis of his membership in this protected class, including having his position undermined and eliminated, as well as allowing him to be racially harassed at work by customers.

132. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

133. Plaintiff notified Defendant, through its agents/Management, of the unwelcomed conduct and communication and Defendant failed to remedy the unwelcomed conduct or communication.

134. The unwelcomed conduct or communication was intended to or in fact did substantially interfere with Plaintiff's employment and created an intimidating, hostile, or offensive work environment, as alleged in the statement of facts.

135. As a proximate result of the Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

136. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

137. Plaintiff requests the relief as described in the Prayer for Relief below.

## COUNT VI
### DISCRIMINATION ON THE BASIS OF DISABILITY IN VIOLATION OF TITLE I OF THE AMERICANS WITH DISABILITIES ACT OF 1990 42 U.S.C. § 12101, et seq. ("ADA")

138. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

139. At all material times, Plaintiff was an employee, and Defendant was Plaintiff's employer, covered by and within the meaning of the ADA.

140. A respondeat superior relationship existed because agents of Defendant, including Griffith and Arthur, had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity.

141. Plaintiff had a prior broken ankle and had recently injured the ankle again at the time of his discharge; as a result, Plaintiff has a disability within the meaning of the ADA, and/or Defendant regarded him as disabled.

142. Plaintiff's disabilities under the ADA are qualified, meaning that, with reasonable accommodation, he can perform the essential functions and duties of his job.

143. Section 12112(a) of the ADA, makes it illegal to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

144. Plaintiff was discriminated against on the basis of his disability when Defendant refused to allow him to return to work, took him off of the schedule, and then terminated him for alleged attendance issues.

145. Defendant's unlawful employment practices were done intentionally, with malice, or with reckless indifference to Plaintiff's rights.

146. But for Defendant's illegal discrimination Plaintiff would not have damaged, discharged, nor constructively discharged.

147. As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

148. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

149. Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT VII
## DISCRIMINATION ON THE BASIS OF DISABILITY IN VIOLATION OF THE TENNESSEE DISABILITY ACT ("TDA")

150. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

151. At all material times, Plaintiff was an employee, and Defendant was Plaintiff's employer, covered by and within the meaning of the TDA.

152. A respondeat superior relationship existed because agents of Defendant, including Griffith and Arthur, had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity.

153. Plaintiff has a disability within the meaning of the TDA, and/or was regarded as disabled by Defendant and its agents.

154. Plaintiff's disability is qualified, meaning that, with reasonable accommodation, he can perform the essential functions and duties of his job.

155. The TDA makes it illegal for an employer to discriminate against an employee because of a physical, mental, or visual disability.

156. Plaintiff was discriminated against on the basis of his disability when Defendant refused to allow him to return to work, took him off of the schedule, and then terminated him for alleged attendance issues.

157. Defendant's unlawful employment practices were done intentionally, with malice, or with reckless indifference to Plaintiff's rights.

158. But for Defendant's illegal discrimination Plaintiff would not have been damaged.

159. As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

160. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

161. Plaintiff requests relief as described in the Prayer for Relief below.

## **RELIEF REQUESTED**

PLAINTIFF, William Kelly, RESPECTFULLY REQUESTS that this Court enter judgment against Defendant as follows:

1. Compensatory damages;
2. Exemplary damages;
3. An award of lost wages and the value of fringe benefits, past and future;
4. An award of interest, costs, and reasonable attorney fees; and
5. An order awarding whatever other equitable relief appears appropriate at the time of final judgment.

Respectfully Submitted,

Dated: June 12, 2023

/s/ Carla D. Aikens

Carla D Aikens
*Attorney for Plaintiff*
615 Griswold Ste. 709
Detroit, MI 48226
carla@aikenslawfirm.com

UNITED STATES DISTRICT COURT
OF THE WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| WILLIAM KELLY, | ) |
|       PLAINTIFF, | ) |
| | ) CIVIL ACTION NO. |
| VS. | ) |
| THREE RIVERS MARKET, | ) |
| | ) HON. |
|       DEFENDANT. | ) |

## **JURY DEMAND**

NOW COMES Plaintiff, WILLIAM KELLY, and hereby demands trial by jury.

Respectfully Submitted,

Dated: June 12, 2023

/s/ Carla D. Aikens

Carla D Aikens
*Attorney for Plaintiff*
615 Griswold Ste. 709
Detroit, MI 48226
carla@aikenslawfirm.com